UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| LATASHA JOHNSON, for Herself and as Next Fried of A.D.J., A.T.J., T.J.J. and T.F.W., the surviving minor children of Antonio L. Johnson, deceased,<br><br>    Plaintiffs,<br><br> vs.<br><br>CITY OF HAZELWOOD, et al.,<br><br>    Defendants. | Case No. 4:14CV00286 SNLJ |

## **MEMORANDUM AND ORDER**

This case is before the Court on "Defendants' Motion for Approval Regarding Minor/Wrongful Death Settlement." The case arises from the death of Antonio Johnson on July 11, 2013, two days after Hazelwood police officers repeatedly tased Johnson while arresting him. Plaintiffs' suit is based on several federal and state law claims, including a claim for wrongful death.

Defendants, who have vigorously defended the suit on the merits, agree to settle without any admission of liability for the amount of $30,000, an amount that they consider the cost of litigation. There are two sets of plaintiffs who constitute all the survivors of the decedent and who are exclusively eligible to share any recovery under the Missouri Wrongful Death Statute, § 537.080 *et seq*. RSMo. The first set consists of the surviving spouse and three children born to her and the decedent. These plaintiffs join in defendants' motion to approve the settlement. The second set consists of five

other children from Johnson's previous relationships. These plaintiffs oppose the settlement.

The Wrongful Death Statute states, in pertinent part:

> . . . if two or more persons are entitled to sue for and recover damages as herein allowed, then **any one or more of them may compromise or settle the claim for damages with approval of any circuit court**, or may maintain such suit and recover such damages without joinder therein by any other person, provided that the claimant or petitioner shall satisfy the court that he has diligently attempted to notify all parties having a cause of action under section 537.080. Any settlement or recovery by suit shall be for the use and benefit of those who sue or join, or who are entitled to sue or join, and of whom the court has actual written notice.

R.S.Mo. § 537.095.1 (emphasis added).

Under this provision, there is no requirement that all plaintiffs agree to the settlement, only that the settlement be approved by the court. Of course, the great majority of wrongful death settlements are approved by the court because there is no objection from any plaintiff or person eligible to take under the settlement. In a small minority of cases, one or more plaintiffs object to the settlement because of their disagreement with the proposed distribution of the proceeds of the settlement. That is not the case here because all plaintiffs agree that the net distribution (after attorneys' fees and costs) – whatever amount that turns out to be – shall be paid one-half to the surviving spouse and one-half in equal portions to all other plaintiffs. Under the proposed $30,000 settlement, after payment of attorneys' fees of $10,000 and costs of $4,686.48, the surviving spouse would receive $15,313.52 and all other plaintiffs $957.09 each. In this unique case, then, the only dispute is the amount of the settlement. The set of plaintiffs including the surviving spouse and her children maintain that $30,000 is a fair and

reasonable settlement given the difficulty of proving liability and the possibility of a defendants' verdict of zero recovery. The other plaintiffs argue that the case is much stronger and would likely result in a verdict greatly exceeding $30,000.

Unfortunately, § 537.095 does not identify a standard for "approval" of the amount of a settlement, and this Court has found no guidance in the case law. However, § 537.090 RSMo., which lists the many factors that a jury should consider in awarding damages, has an overarching requirement that damages are those that "the trier of the facts may deem fair and just for the loss thus occasioned . . . ." A "fair and just" standard, then, seems an appropriate standard for approval of the amount of a settlement. That said, the fairness and justness of the amount necessarily must be informed not only by the actual damages allowable under § 537.090, but also by the likelihood of success if the case were to be tried, both on the questions of liability and allowable damages.

After extensive and voluminous briefing on the issue -- in much the same way that the case would be presented via summary judgment motions -- this Court held a hearing on the matter and entered several findings from the bench. These included that summary judgment would be granted in favor of defendants on all claims except on the federal § 1983 excessive force claim and the state wrongful death claim (also based on excessive force) against defendant Mars only. The focus of the briefing and the presentation at the hearing was on the likelihood of success on the issue of liability, and there was little discussion about damages except for the objecting plaintiffs' conclusory statements that a verdict in favor of plaintiffs would result in a damages award many times greater than the settlement offer.

Although some of the details of the decedent's arrest are in dispute, the incident may be summarized as follows:

After several reports to police about a person driving a vehicle in an erratic manner, Officer Mars located the vehicle on the side of a road and attempted to arrest the driver, Antonio Johnson, for driving while under the influence of alcohol or drugs. Johnson was a big man, six feet five inches tall and nearly 230 pounds, with an athletic build. According to Mars, Johnson had slurred speech and resting nystagmus (indicating either PCP use or brain damage), and Johnson admitted he was intoxicated. Initially, Johnson resisted being handcuffed, refusing Mars' orders to put his hands behind his back. Mars was eventually able to get one hand cuffed, but when Johnson continued to resist, Mars "pulled him to the ground" and finally secured both cuffs.

After conducting two short interviews of witnesses who then left the scene, Mars returned to Johnson, directing him to sit on the curb. Once seated, Johnson attempted to "step through" his cuffs, that is, to lower his cuffed hands below his posterior, bring his knees to his chest, and slip the cuffs under his heels. Concerned that the long-armed Johnson might be able to do so, Mars "climbed on top of Johnson to restrain him and move his hands back to the small of his back." Mars was unsuccessful, later recalling that "Johnson's strength was incredible and I could not get his hands in the proper position." Johnson continued to resist by kicking Mars repeatedly and grabbing Mars by the legs to pull him off balance. At that point, Mars, well-aware that persons who are impaired by PCP can be extremely strong, violent and dangerous, believed himself to be in serious danger. He deployed his Taser, and used it to "drive-stun" Johnson. The

Taser, however, was ineffective, and Johnson continued to try to step through the handcuffs. Mars administered a second Taser cycle, but this, too, was ineffective as Johnson "continued to pull away while attempting to move his hands in front of him," and as Mars noted, "Johnson began kicking me in my upper legs, groin and abdomen." Mars then struck Johnson several times on his arms and legs with a baton, but again, Johnson continued to kick Mars and attempt to step through the handcuffs.

A second officer -- Officer Kenner -- then arrived, but both officers together were unable to pull Johnson's arms behind his back because "he was just too strong." Mars relates that "Johnson began to roll around and he grabbed Kenner's right hand. As Johnson was grabbing Officer Kenner's hand, he continued to kick me and Kenner lost his balance and fell forward, landing on Johnson's legs." Kenner was able to pull away from Johnson, but "Johnson again moved his hands toward his feet." Although Mars then fired his Taser again at Johnson, Johnson continued to roll on the ground attempting to get his hands in front of him. Kenner then fired his Taser at Johnson, striking him in the back. When a third officer arrived to assist, Johnson was still combative, but the three of them were finally able to move Johnson's hand to the small of his back. Johnson finally ceased resisting and was rolled over on his back. About eight minutes had elapsed since Johnson first tried to step out of his handcuffs.

Because Johnson had a laceration on his face and out of concern that he was under the influence of PCP, the officers summoned an ambulance. By the time the ambulance arrived, Johnson was semiconscious, but he was responsive to questions and could move his extremities. When he arrived at the hospital, his condition had deteriorated

considerably. He died, according to the autopsy report of the medical examiner, of "Multiple organ failure secondary to hypotension. . .Due to. . .Hypertensive heart disease exacerbated by struggle and phencyclidine [PCP] intoxication." The medical examiner later confirmed his opinion based on "a reasonable degree of medical certainty." He added that, "sudden collapse/death is a well-recognized complication of PCP that typically, but not always, occurs after, not during, a violent struggle in which forcible restraint is used."

The objecting plaintiffs' version of the matter, which is in some respects merely a different interpretation of the same facts, is that the officers used excessive force by repeatedly Tasing and beating Johnson, thereby causing his death. They argue first, that the medical examiner's determination that the cause of death was in any way due to PCP intoxication should be discounted because 1) "no drugs or drug paraphernalia were found on Johnson's person or in his vehicle;" 2) neither the ambulance personnel nor the medical examiner documented "resting nystagmus" as reported by Officer Mars; 3) "PCP can be detected in the urine for up to 7 days, and in the blood for up to 24 hours;" indicating that Johnson's ingestion of PCP may have had no bearing on his conduct at the time of the arrest; and 4) although Johnson's wife acknowledged that he used PCP a week or so before the arrest, the effect was to make him "childlike," not combative. In view of this evidence, and details from the autopsy report, plaintiffs' medical expert testified via deposition that a diagnosis of PCP intoxication was wholly "speculative." He concluded, instead, that the cause of death was brought on by multiple organ failure

6

"engendered by a period of shock" that was in turn brought on, in part, by "the combination of Tasings and being beaten with a baton."

Regarding the altercation, itself, plaintiffs claim that there was no need to Tase or beat Johnson at all, and that the most force that was justified -- as indicated by plaintiffs' police procedures expert -- was mace or pepper spray.  Plaintiffs first note that to the extent Johnson initially resisted being handcuffed, he was trying to answer cell phone calls from his wife, and at no time, even after the witnesses had been released, did Johnson attempt to flee.  They next claim that there was no way Johnson could "step out" of the handcuffs behind his back, "a feat that probably could only be accomplished by a contortionist," and that the handcuffs were so tight that the paramedics couldn't take his blood pressure.  They emphasize most of all that the Taser logs showed 13 deployments, rather than the five or six documented in the police report, and the autopsy pictures showed blunt trauma from baton beatings "from head to toe."  The whole affair, plaintiffs conclude, was due to Officer Mars putting himself "in a situation of his own making."

In view of these differing accounts, this Court has the difficult task of weighing the likelihood of success of one against the other, a kind of case evaluation usually undertaken by litigants and their attorneys, rather than judges.  In this endeavor, the Court is mindful of the well-settled law on the Fourth Amendment prohibition of excessive force.  To determine whether force was excessive in effectuating an arrest, the question is, "…whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor,* 490 U.S. 388, 397.  And further, "The calculus of reasonableness

must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation. *Id*. at 396-97.

Although this appears to be a case that should be submitted to a jury as to Officer Mars, a defendant's verdict is more likely than not. Without detailing the respective credentials and testimony of the competing medical experts, suffice it to say that the medical examiner is eminently well-qualified, more so than plaintiffs' medical expert, and too, plaintiffs' expert's deposition testimony was significantly diluted after vigorous and compelling cross-examination by defense counsel. Plaintiffs have the same problems with the credentials and testimony of their liability expert, a former police sergeant who had never carried or deployed a Taser, as opposed to defendants' expert, a certified Taser instructor. In addition, the seemingly excessive use of 13 Taser deployments included several that were unsuccessful, causing no harm; and further, the deployments that were successful were not made continuously, but only after warnings and Johnson's constant non-compliance. But surely, the weakest part of plaintiffs' case is the largely uncontroverted evidence that Johnson fought with Officer Mars for the duration of the encounter and that in fact Mars was unable to subdue Johnson without the multiple tasings, the baton strikes and the assistance of two more officers. All this is to say that the evidence in these extreme circumstances supports the conclusion that Officer Mars' conduct was not excessive, but reasonable.

In determining whether the amount of the settlement is fair and just, it bears mention as well that the plaintiffs' group supporting the settlement -- the surviving

spouse and her three children -- would take a majority of the agreed-on disposition of the settlement proceeds. Because they are the ones with the most to gain or lose by agreeing to the settlement, their decision to take the $30,000 sure thing rather than gamble on a much larger verdict should be given more weight than the opinion of the opposing plaintiffs' group. Furthermore, counsel for the pro-settlement plaintiffs is an experienced and successful trial lawyer who handled the case from the beginning, including all the substantial discovery proceedings, and his evaluation also should be given more weight. Indeed, as part of the settlement, he cut his attorneys fees by some $84,000 ($94,000 - $10,000) in order to effect the settlement. In contrast, counsel for the opposing plaintiffs did not participate in the formal discovery proceedings at all, and they relied mostly on the information generated by counsel for the other litigants.

For the foregoing reasons, this Court finds the amount of the settlement agreement is fair and just and that the requirements of the Wrongful Death Statute have been satisfied in all other respects. Accordingly, the motion for approval is granted, and the parties are directed to submit a proposed formal judgment in accordance with these findings as soon as practicable.

**SO ORDERED** this 7th day of February, 2017.

_____
STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE